Citation Nr: 1220794 
Decision Date: 06/14/12 Archive Date: 06/22/12

DOCKET NO. 09-18 694 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO)
 in Baltimore, Maryland


THE ISSUES

1. Entitlement to service connection for eye coronary pressure.

2. Entitlement to service connection for obstructive sleep apnea.

3. Entitlement to a rating in excess of 50 percent for posttraumatic stress disorder (PTSD) prior to April 10, 2008.

4. Entitlement to a rating in excess of 50 percent for posttraumatic stress disorder (PTSD) from April 10, 2008.

5. Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected PTSD.


ATTORNEY FOR THE BOARD

G. Slovick, Associate Counsel
INTRODUCTION

The Veteran served on active duty from November 1984 to March 1986, from February 1992 to June 1993, and from July 1996 to March 1997. He had additional service in the Army National Guard.

This appeal to the Board of Veterans' Appeals (Board) arose from a June 2008 rating decision in which the RO denied service connection for eye coronary pressure and obstructive sleep apnea, and continued a 50 percent disability rating for PTSD. In July 2008, the Veteran filed a notice of disagreement (NOD). A statement of the case (SOC) was issued in March 2009, and the Veteran filed a substantive appeal (via a VA Form 9, Appeal to the Board of Veterans' Appeals) in March 2009. 

As explained in further detail in the remand below, the Veteran indicated in his claim for an increased rating that was unable to maintain employment because of his PTSD. As explained in more detail, below, the appeal has now been expanded to include the matter of the Veteran's entitlement to a TDIU due to his service-connected PTSD. See Rice v. Shinseki, 22 Vet. App. 447 (2009).

The Board's decisions addressing the claims service connection for eye coronary pressure and for a higher rating for PTSD prior to April 10, 2008 are set forth below. The matters of entitlement to service connection for obstructive sleep apnea, entitlement to an increased rating in excess of 50 percent from April 10, 2008 and for TDIU due to service-connected disabilities are addressed in the remand following the order; this matter is being remanded to the RO, via the Appeals Management Center (AMC), in Washington, DC. VA will notify the appellant when further action, on his part, is required.


FINDINGS OF FACT

1. All notification and development actions needed to fairly adjudicate each claim herein decided have been accomplished.

2. Although the record demonstrates suspected glaucoma, there is no evidence of any in-service complaints or findings of a diagnosis pertinent to glaucoma or vision loss and no competent medical opinions which links any eye disorder to service.

3. Prior to April 10, 2008, the Veteran's psychiatric symptoms primarily included chronic sleep impairment with nightmares, depressed mood, anxiety, isolation, hypervigilance, flashbacks, irritability and disturbances of motivation in mood; collectively, these symptoms reflect occupational and social impairment with reduced reliability and productivity.


CONCLUSIONS OF LAW

1. The criteria for service connection for eye coronary pressure are not met. 38 U.S.C.A. §§ 1101, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.102, 3.159, 3.303 (2011).

2. The criteria for a rating in excess of 50 percent for PTSD prior to April 10, 2008, are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.3, 4.7, 4.126(a), 4.130, Diagnostic Code 9411 (2011). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126 (West 2002 & Supp. 2011)) includes enhanced duties to notify and assist claimants for VA benefits. VA regulations implementing the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a) (2011).

Notice requirements under the VCAA essentially require VA to notify a claimant of any evidence that is necessary to substantiate the claims, as well as the evidence that VA will attempt to obtain and which evidence he or she is responsible for providing. See, e.g., Quartuccio v. Principi, 16 Vet. App. 183 (2002) (addressing the duties imposed by 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b)). As delineated in Pelegrini v. Principi, 18 Vet. App. 112 (2004), after a substantially complete application for benefits is received, proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim(s); (2) that VA will seek to provide; (3) that the claimant is expected to provide; and (4) must ask the claimant to provide any evidence in her or his possession that pertains to the claim(s), in accordance with 38 C.F.R. §3.159(b)(1).

The Board notes that, effective May 30, 2008, 38 C.F.R. § 3.159 has been revised, in part. See 73 Fed. Reg. 23,353- 23,356 (April 30, 2008). Notably, the final rule removes the third sentence of 38 C.F.R. § 3.159(b)(1), which had stated that VA will request that a claimant provide any pertinent evidence in his or her possession.

VA's notice requirements apply to all five elements of a service connection claim: veteran status, existence of a disability, a connection between a veteran's service and the disability, degree of disability, and effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). In rating cases, a claimant must be provided with information pertaining to assignment of disability ratings (to include the rating criteria for all higher ratings for a disability), as well as information regarding the effective date that may be assigned. Id.

VCAA-compliant notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the agency of original jurisdiction (in this case, the RO). Id.; Pelegrini, 18 Vet. App. at 112. See also Disabled American Veterans v. Secretary of Veterans Affairs, 327 F.3d 1339 (Fed. Cir. 2003). However, the VCAA notice requirements may, nonetheless, be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. Id.

In this appeal, in April 2007 and May 2008 pre-rating letters, the RO provided notice to the Veteran explaining what information and evidence was needed to substantiate the claim for service connection, as well as what information and evidence must be submitted by the appellant, and what information and evidence would be obtained by VA. The June 2008 RO rating decision reflects the initial adjudication of the claim after issuance of the April 2007 and May 2008 letters. 

The April 2007 and May 2008 letters also provided the Veteran with information pertaining to the assignment of disability ratings and effective dates, as well as the type of evidence that impacts those determinations, consistent with Dingess/Hartman. 

The record also reflects that VA has made reasonable efforts to obtain or to assist in obtaining all relevant records pertinent to the matters herein decided. Pertinent medical evidence associated with the claims file consists of service, VA treatment records, VA examination reports, and private treatment records. Also of record and considered in connection with the appeal are various statements provided by the Veteran and his family members. 

The Board finds that no additional RO action prior to appellate consideration of any claim herein decided is warranted. In this regard, the Board has considered whether a VA examination is necessary in conjunction with the Veteran's claim for service connection for eye disability. See 38 C.F.R. § 3.159(c)(4). However, as explained in more detail below, here, the Board finds that a VA examination in connection with this claim is not necessary, as the evidence does not indicate that any current eye disability may be associated with any established event, injury, or disease in service. See 38 C.F.R. § 3.159(c)(4). Notably, the record does not contain medical evidence suggesting such an association or evidence of continuity of eye symptomatology. See McClendon v. Nicholson, 20 Vet. App. 79, 83 (2006). 

In summary, the duties imposed by the VCAA have been considered and satisfied. Through various notices of the RO, the Veteran has been notified and made aware of the evidence needed to substantiate the claims, the avenues through which he might obtain such evidence, and the allocation of responsibilities between himself and VA in obtaining such evidence. There is no additional notice that should be provided, nor is there any indication that there is additional existing evidence to obtain or development required to create any additional evidence to be considered in connection with these claims. Consequently, any error in the sequence of events or content of the notice is not shown to prejudice the Veteran or to have any effect on the appeal. Any such error is deemed harmless and does not preclude appellate consideration of the matters herein decided, at this juncture. See Mayfield v. Nicholson, 20 Vet. App. 537, 543 (2006) (rejecting the argument that the Board lacks authority to consider harmless error). See also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998).

II. Service Connection for Eye Coronary Pressure

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. Service connection may be granted for any disease diagnosed after discharge from service when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Considering the pertinent evidence in light of the above-noted legal authority, the Board finds that service connection for eye coronary pressure is not warranted.

The Veteran's service treatment records do not reflect any complaint, finding, or diagnosis pertaining to coronary pressure or any impairment of the eye. No abnormalities with respect to the eyes or vision were noted at the time of discharge. 

With respect to post-service medical records, treatment records dated in November 2007 demonstrate that the Veteran was treated for a hemorrhage in his right eye and include an assessment of suspected glaucoma. Treatment records dated in November 2007 also demonstrate a history of glaucoma in the Veteran's family history on his mother's side. 

Initially, the Board notes that the record is unclear as to a diagnosis of a current disability manifested by vision loss. 

However, even if the Board were to accept that there is evidence of a current, definitive diagnosis of an eye disability manifested by vision loss, such as glaucoma, the claim would still have to be denied on the basis of medical nexus and an in-service incurrence of a disorder. 

The Board has considered the assertions of the Veteran and his representative to the effect that his eye disorder is due to service; however, this evidence does not provide a basis for allowance of the claim. As indicated above, the claims turn on the medical matter of whether the Veteran has the current disability for which service connection is sought (here, requiring a medical diagnosis), and, if so, whether there exists a medical nexus between any such disorder and service. Matters of diagnosis and etiology of disabilities capable of lay observation are within the province of trained medical professionals. See Jones v. Brown, 7 Vet. App. 134, 137-38 (1994). As neither the Veteran is shown to be a layperson without the appropriate medical training and expertise, neither is competent to render a probative (persuasive) opinion on a medical matter. See, e.g., Bostain v. West, 11 Vet. App. 124, 127 (1998), citing Espiritu v. Derwinski, 2 Vet. App. 492 (1992). See also Routen v. Brown, 10 Vet. App. 183, 186 (1997) ("a layperson is generally not capable of opining on matters requiring medical knowledge"). Hence, the lay assertions in this regard have no probative value 

As indicated above, in this case, there is no medical evidence or opinion confirming that the Veteran has a current eye disability, or even suggesting that there exists a medical nexus between any current eye disability and service, and neither the Veteran nor his representative has presented any such evidence or opinion. 

As noted above, in this case, the record lacks evidence of an in-service eye disorder, competent medical evidence which relates an eye disorder to service, or persistent or recurrent symptoms of disability. The evidence does not establish that the Veteran suffered an event, injury, or disease in service, nor does it indicate that the claimed eye disorder or symptoms may be associated with the Veteran's service. Thus, on these the evidence of record does not warrant further development in the form of a VA examination as the requirements for such an examination have not been met. See 38 U.S.C.A. § 5103A ; 38 C.F.R. § 3.159; McClendon v. Nicholson, 20 Vet. App. 79 (2006). 

For all the foregoing reasons, the claim for service connection for a vision problem must be denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, as no competent, probative evidence supports this claim, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

III. Higher Rating for PTSD prior to April 10, 2008

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities, which is based on average impairment of earning capacity resulting from a service-connected disability. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. Where there is a question as to which of two ratings shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3.

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where, as here, entitlement to compensation already has been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Nevertheless, the Board acknowledges that a claimant may experience multiple distinct degrees of disability that might result in different levels of compensation from the time the increased rating claim was filed until a final decision is made. Hart v. Mansfield, 21 Vet. App. 505, 509-10 (2007). 

In this case, the Veteran's claim for an increased rating has been bifurcated into two issues determining the appropriate rating for PTSD prior to, and after, April 10, 2008. The staging of rating periods in this case is based on the last record in which the degree of severity of the Veteran's PTSD symptoms may be determined, here April 9, 2008, the date in which the Veteran was provided with psychiatric treatment at the Washington VA medical center. 

Although the ratings for Veteran's PTSD have been assigned under Diagnostic Code 9411, the actual criteria for rating psychiatric disabilities other than eating disorders is set forth in a general rating formula. See 38 C.F.R. § 4.130.

Under that criteria, a 50 percent rating is assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 

A 70 percent rating is assigned for occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships.

A 100 percent rating is assigned for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent ability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of closes relatives, own occupation, or own name.

Psychiatric examinations frequently include assignment of a Global Assessment of Functioning (GAF) score. According to the Fourth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." There is no question that the GAF score and interpretations of the score are important considerations in rating a psychiatric disability. See e.g., Richard v. Brown, 9 Vet. App. 266, 267 (1996); Carpenter v. Brown, 8 Vet. App. 240 (1995). However, the GAF score assigned in a case, like an examiner's assessment of the severity of a condition, is not dispositive of the evaluation issue; rather, the GAF score must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a). 

Historically, the Veteran was granted service connection for PTSD and assigned a 50 percent disability rating by the Baltimore RO in a February 2004 rating decision. In March 2007, the Veteran submitted a statement noting that he wished to be reevaluated for his PTSD because he believed that his condition had increased in severity. 

Following his claim for an increased rating, in April 2007, the Veteran was afforded a new VA examination. During his examination it was noted that the Veteran reported symptoms to include impaired sleep with nightmares, flashbacks, intrusive thoughts and images of combat trauma, avoidance of reminders of the war, hypervigilance, enhanced startle response, irritability and anger management difficulties with extreme difficulty maintaining relationships and/or employment. 

The Veteran also described depression and social withdrawal and isolation. It was noted that the Veteran had previously attended a PTSD coping skills class which reduced the intensity of his symptoms.

The Veteran reported that he was unable to work secondary to poor energy and motivation, mood instability and lack of interest. He additionally reported declines in hygiene and grooming. He stated that he drank at least a six pack of beer a day. He stated that he no longer interacted with friends and cut himself off others with the exception of his brother. The Veteran reported that he was involved in frequent verbal confrontations. He stated that he had not worked for the last four months secondary to PTSD, depression and alcohol abuse. 

On mental status examination the Veteran was found to have no impairment of thought process or communication, no delusions or hallucinations. The examiner stated that behavior was appropriate and that suicidal thought and ideations were absent. It was noted that the Veteran was unable to maintain personal hygiene and activities of daily living and that he was oriented to person, place and time. A moderate short term memory problem was noted. There was no obsessive or ritualistic behavior found, speech was normal, panic attacks were not present. The presence of moderate chronic depression and moderate sporadic anxiety was noted as was sleep impairment with the Veteran reporting that he got about three to four hours of sleep per night.

The examiner noted that bipolar disorder and alcohol abuse were additional disorders and symptoms which may interfere with the Veteran's activities. It was further noted that bipolar disorder was independently responsible for some impairments. The examiner noted that the Veteran's PTSD severely impaired his ability to be employed and to maintain relationships. A moderate affect on activities of daily living was noted. The examiner stated that the Veteran's employability was poor but that the Veteran was not unemployable. A GAF score of 50 was provided. The Veteran was found to be capable of managing benefit payments.

In an April 2007 statement, the Veteran stated that his PTSD was getting worse, he stated that it was hard to watch the news. He stated that he hadn't been employed since 2003 and could not stay in a relationship for more than two months. He reported recurring nightmares and did not trust anyone. 

The report of an October 2007 VA psychology initial evaluation reflects that the Veteran was divorced and that he was unemployed since 2002. On mental status evaluation, activities of daily living were within normal limits, speech was normal and the Veteran was found to be oriented to person, place and time. Moderate short term memory and moderate long term memory problems were noted. The Veteran reported frequent interrupted sleep and nightmares. Energy was within normal limits and mild anxiety was reported. Insight and judgment were intact. The Veteran reported emotional and social withdrawal. 

An October 2007 VA psychiatry note indicates that the Veteran wished to resume medication for his PTSD. He additionally described frequent recollections of combat and occasional nightmares and fluctuations in mood. He reported that he was irritable and isolative. He reported that he had a strained relationship with a girlfriend and saw his daughter. He stated that he wanted to get a compensated work therapy job and eventually join the work force. The treating physician noted a normal mental status with no suicidal ideation. 

The claims file includes a September 2008 letter from the Veteran's younger, brother, M.A., which states that since his service, he had noticed a great decline in the Veteran's mental alertness. M.A. also stated that the Veteran had mood swings and was constantly in and out of relationships, noting that the Veteran could not maintain a solid relationship with a woman or with his children. M.A. noted that the Veteran was depressed and that he worked in construction with the Veteran and had a hard time understanding directions and being motivated. 

An April 2008 VA psychiatric note reported that the Veteran had been depressed and irritable following his prescription running out. It was noted that the Veteran broke up with his girlfriend and stayed in touch with his children and that he had been working for his brother's contracting business. The Veteran was noted to have a cheerful, euythmic, normal mental status. He was found to have mild anxiety and an appropriate affect. He described verbal conflicts with others. He reported that he was in a lousy mood and that the slightest thing made him mad. Suicidal ideation was not found. Diagnoses of bipolar affective disorder and PTSD and a GAF score of 52 were provided. 

Considering the pertinent evidence of record in light of the above, the Board finds that, the criteria for a rating in excess of 50 percent have not been met at any point prior to April 10, 2008.

The above-cited medical evidence reflects that prior to April 10, 2008, the Veteran's PTSD has primarily been manifested by depressed mood, anxiety, panic attacks, chronic sleep impairment, isolation, disturbances of motivation in mood, social isolation, irritability, hypervigilance, avoidance and nightmares, these symptoms reflect occupational and social impairment with reduced reliability and productivity. This is a level of occupational and social impairment no greater than what is contemplated in the currently assigned 50 percent disability rating. 

Accordingly, the Board finds that, for the period for the period prior to April 10, 2008, a higher 70 percent disability rating for PTSD is not warranted. 

At no point, throughout the period considered, has the Veteran's PTSD met the criteria for the next higher 70 percent rating. As noted above, under the General Rating Formula, a 70 percent rating is warranted when there is occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish effective relationships. The objective medical evidence does not show such symptoms such as: active suicidal ideation, impaired judgment, obsessional rituals, illogical speech, near-continuous panic, and spatial disorientation, or an inability to establish effective relationships.

Notably the record has demonstrated some decrease in social functioning and the Veteran's ability to retain employment is shown by the April 2007 VA examination to be severely impaired, however, the VA examiner stated that his PTSD had a moderate affect on his activities of daily living. Additionally, October 2007 psychiatric notes demonstrate that the Veteran was actively seeking employment which suggests an exaggeration of symptoms during the VA examination. The Veteran is shown by his brother to be able to retain some employment and, while he is noted to have trouble concentrating, this does not reach the level of severity described by the symptoms in the 70 percent disability criteria. 

Additionally, the evidence demonstrates impairment in social functioning and reports that the Veteran has decreased ability to maintain hygiene. The Veteran is shown, however, throughout the period on appeal to have relationships with his brother, children and girlfriends, demonstrating a social impairment which most closely approximates the limitations in social functioning described by the 50 percent rating criteria. Regarding the lay statements offered in support of the Veteran's claim, to include the M.A.'s statement which includes a report of poor hygiene, one of the symptoms described in the 70 percent rating criteria, the Board finds that, when considered in lieu of the totality of the evidence of record, the lay statements of the Veteran and his brother M.A., do not demonstrate that the Veteran's symptoms warrant a higher 70 percent disability rating. 

In determining that the criteria for a rating in excess of 50 percent for the Veteran's service-connected PTSD are not met, the Board has considered the applicable rating criteria not as an exhaustive list of symptoms, but as examples of the type and degree of the symptoms, or effects, that would justify a particular rating. The Board has not required the presence of a specified quantity of symptoms in the rating schedule to warrant the assigned rating for the psychiatric disability in question. See Mauerhan v. Principi, 16 Vet. App. 436 (2002).

The Board further finds that none of the GAF scores assigned since the effective date of the award of service connection, alone, provides a basis for assigning a rating in excess of 50 percent for PTSD for any period on appeal. For the period on appeal, the Veteran has received GAF scores of 50 and 52. GAF scores between 51 and 60 describe moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). In this case, the Board finds that the higher GAF score of 52 is consistent with a finding that the Veteran's PTSD presents an occupational and social impairment with reduced reliability and productivity but does not demonstrate occupational and social impairment with deficiencies in most areas. 

The Board notes that the record also reflects a GAF score of 50. A GAF score from 41 to 50 demonstrate serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). However, the medical evidence of record reflects that the Veteran exhibited none of the symptoms identified in the DSM-IV as indicative of such a score. Accordingly, despite the assigned GAF score of 50, the medical evidence does not demonstrate that the criteria for a higher rating have been met. 

Based on the foregoing, the Board finds that for the period prior to April 10, 2008 the Veteran's psychiatric symptomatology most nearly approximates the criteria for a 50 percent rating. See 38 C.F.R. § 4.7. As the criteria for the next higher, 70 percent, rating have not been met, it logically follows that the criteria for higher rating of 100 percent likewise are not met.

The above determinations are based on application of pertinent provisions of VA's rating schedule. Additionally, the Board finds that at no point prior to April 10, 2008 has the Veteran's PTSD been shown to be so exceptional or unusual as to warrant the assignment of any higher rating on an extra-schedular basis. See 38 C.F.R. § 3.321.

The threshold factor for extra-schedular consideration is a finding on the part of the RO or the Board that the evidence presents such an exceptional disability picture that the available schedular ratings for the service-connected disability at issue are inadequate. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993). See also 38 C.F.R. § 3.321(b)(1) (2011); VA Adjudication Procedure Manual, Pt. III, Subpart iv, Ch. 6, Sec. B(5)(c). Therefore, initially, there must be a comparison between the level of severity and the symptomatology of the claimant's disability with the established criteria provided in the rating schedule for this disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned rating is therefore adequate, and no referral for extra-schedular consideration is required. See VAOGCPREC 6-96 (Aug. 16, 1996). Thun v. Peake, 22 Vet. App. 111 
(2008).

If the rating schedule does not contemplate the claimant's level of disability and symptomatology, and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms" (including marked interference with employment and frequent periods of hospitalization). 38 C.F.R. § 3.321(b)(1). If so, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for completion of the third step: a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extra-schedular rating. Thun, supra.

In this case, the Board finds that schedular criteria are adequate to rate the disability under consideration at all relevant periods. The rating schedule fully contemplates the described symptomatology, and provides for ratings higher than those assigned based on more significant functional impairment. Thus, the threshold requirement for invoking the procedures set forth in 38 C.F.R. § 3.321(b)(1) is not met. See Bagwell v. Brown, 9 Vet. App. 337, 338-9 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995). 

In reaching these conclusions, the Board has considered the applicability of the benefit-of-the doubt doctrine; however, as the preponderance of the evidence is against assignment of a higher rating, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert, 1 Vet. App. at 53-56.


ORDER

Service connection for eye coronary pressure is denied.

An increased rating in excess of 50 percent for posttraumatic stress disorder (PTSD) prior to April 10, 2008, is denied.


REMAND

The Board's review of the claims file reveals that further RO action on the claims for service connection for obstructive sleep apnea, an increased rating for PTSD from April 10, 2008 and entitlement to TDIU due to service-connected PTSD is necessary. 

VA will provide a medical examination or obtain a medical opinion if the record, including lay or medical evidence, contains competent evidence of a disability that may be associated with an event, injury, or disease that occurred in service, but the record does not contain sufficient medical evidence to decide the claim. 38 U.S.C.A. § 5103A(d) (West 2002); McLendon v. Nicholson, 20 Vet. App. 79 (2006). The threshold for determining whether the evidence "indicates" that there "may" be a nexus between a current disability and an in-service event, injury, or disease is a low one. McLendon, 20 Vet. App. at 83. 

The Board notes that the Veteran's claims file includes the lay observations of the Veteran and his family members which note that his snoring began during his service. Symptoms capable of lay observation may go to demonstrate that a condition was incurred in service, where found credible. See Layno v. Brown, 6 Vet. App. 465, 470 (1994); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). 

Post-service treatment records include diagnosis of obstructive sleep apnea. Notably, the Veteran is shown to smoke cigarettes and treatment records demonstrate obesity. 

Under these circumstances, the Board finds that VA examination and a medical opinion-based on full consideration of the Veteran's documented medical history and assertions, and supported by clearly-stated rationale- would be helpful in resolving the claim for service connection. See 38 U.S.C.A. § 5103A ; 38 C.F.R. § 3.159; McClendon, supra. 

Regarding matter of a higher rating for PTSD, the Board notes that, the claims file includes the report of a January 2012 VA examination. The VA examiner was able to document the Veteran's reported symptoms; however, he stated that, at the time of examination the Veteran was "manic or becoming manic" and that, due to these symptoms, the Veteran's elated mood made it impossible to evaluate his PTSD. The VA examiner noted that the Veteran would need to be rescheduled after he was stabilized on medication. 

As the VA examiner was unable to make a complete determination regarding the Veteran's symptomology and the affect of his symptoms on his ability to function, a new VA examiner is in order. The RO should arrange for the Veteran to undergo VA examination, by an appropriate physician, at a VA medical facility. 

Finally, during the pendency of his appeal, the Veteran submitted evidence, to include his March 2007 claim for an increased rating for PTSD indicating that he is unable to work because of his service-connected PTSD. Thus, he appears to raise the matter of his entitlement to a TDIU in the context of his claim for a higher rating. Given this, the claim for a TDIU is essentially a component of the claim for higher rating. See Rice v. Shinseki, 22 Vet. App. at 447.

The Board notes, however, that the RO has not adjudicated a claim for a TDIU. Under these circumstances, after giving the Veteran an opportunity to file a formal claim for a TDIU, and completing the action pertinent to such claim, an opinion as to whether the Veteran is unable to secure or follow a substantially gainful occupation by reason of service-connected disabilities should be obtained. Thereafter, the RO should adjudicate the matter of the Veteran's entitlement to a TDIU.

The Veteran is hereby advised that failure to report for the scheduled examination, without good cause, may result in denial of his claims. See 38 C.F.R. § 3.655 (2011). Examples of good cause include, but are not limited to, the illness or hospitalization of the claimant and death of an immediate family member. Id. If the Veteran fails to report for the scheduled examination, the RO must obtain and associate with the claims file (a) copy(ies) of any notice(s) of the date and time of the examination sent to the Veteran by the pertinent VA medical facility. 

Prior to arranging for the Veteran to undergo further examinations, the RO should also obtain and associate with the claims file all outstanding VA treatment records. The claims file includes VA outpatient treatment records from the Washington D.C. VA Medical Center (VAMC) dated through February 19, 2009. The Board emphasizes that records generated by VA facilities that may have an impact on the adjudication of a claim are considered constructively in the possession of VA adjudicators during the consideration of the claim, regardless of whether those records are physically on file. See Dunn v. West, 11 Vet. App. 462, 466-67 (1998); Bell v. Derwinski, 2 Vet. App. 611, 613 (1992). Hence, the RO must obtain any outstanding records of treatment for right shoulder disability from the Washington D.C. VAMC since February 19, 2009, following the current procedures prescribed in 38 C.F.R. § 3.159(c) as regards requests for records from Federal facilities. 

Also, to ensure that all due process requirements are met, and that the record before the examiner is complete, the RO should give the appellant another opportunity to provide information and/or evidence pertinent to the claims on appeal, explaining that he has a full one-year period for response. See 38 U.S.C.A. § 5103(b)(1) (West 2002); but see also 38 U.S.C.A. § 5103(b)(3) (West Supp. 2011) (amending the relevant statute to clarify that VA may make a decision on a claim before the expiration of the one-year notice period). 

Thereafter, the RO should attempt to obtain any additional evidence for which the Veteran provides sufficient information, and, if needed, authorization, following the current procedures prescribed in 38 C.F.R. § 3.159 (2011). 

The actions identified herein are consistent with the duties imposed by the Veterans Claims Assistance Act of 2000 (VCAA). See 38 U.S.C.A. §§ 5103, 5103A (West 2002); 38 C.F.R. § 3.159 (2011). However, identification of specific actions requested on remand does not relieve the RO of the responsibility to ensure full compliance with the VCAA and its implementing regulations. Hence, in addition to the actions requested above, the RO should also undertake any other development and/or notification action deemed warranted by the VCAA prior to adjudicating the claim on appeal. The RO's adjudication of the claim for increased rating for PTSD should include consideration of whether "staged rating" (assignment of different ratings for distinct periods of time, based on the facts found) pursuant to Hart v. Mansfield, 21 Vet. App. 505 (2007), is appropriate

Accordingly, the case is REMANDED for the following action:

1. The RO should issue the Veteran appropriate VCAA notice concerning the information and evidence necessary to substantiate a claim for TDIU. The letter should include a VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability, for the Veteran to complete.

The RO should additionally send to the Veteran a letter requesting that the Veteran provide sufficient information, and if necessary, authorization to enable it to obtain any additional evidence pertinent to the claims on appeal that is not currently of record. 

The RO's letter should clearly explain to the Veteran that he has a full one-year period to respond (although VA may decide the claim within the one-year period). 

2. If the Veteran responds, the RO should assist him in obtaining any additional evidence identified, following the current procedures set forth in 38 C.F.R. § 3.159. All records/responses received should be associated with the claims file. If any records sought are not obtained, the RO should notify the Veteran of the records that were not obtained, explain the efforts taken to obtain them, and describe further action to be taken. 

3. The RO should obtain from the Washington D.C. VAMC any outstanding, pertinent records of mental health evaluation and/or treatment of the Veteran, since February 19, 2009. The RO must follow the procedures set forth in 38 C.F.R. § 3.159(c) with respect to requesting records from Federal facilities. All records/responses received should be associated with the claims file. 

4. After all records and/or responses received from each contacted entity have been associated with the claims file, the RO should arrange for the Veteran to undergo a VA examinations in conjunction with his service connection, increased rating and TDIU claims. 

The entire claims file, to include a complete copy of the REMAND, must be made available to each individual designated to examine the Veteran, and the report of examination should include discussion of the Veteran's documented medical history and assertions. All appropriate tests and studies should be accomplished (with all results made available to the examiner prior to the completion of each report), and all clinical findings should be reported in detail. 

a) The Veteran is to be afforded a VA examination with a somnologist or other appropriate physician, at a VA medical facility. The physician should clearly indicate whether the Veteran currently has sleep apnea. If so, the physician should render an opinion, consistent with sound medical judgment, as to whether it is at least as likely as not (i.e., there is a 50 percent or greater probability) that the disability was cause or is aggravated (worsened beyond the natural progression by the Veteran's active duty service.) The examiner is asked to take into account in his determination, the lay observations of the Veteran and those provided by his family members.

b) The Veteran is to be afforded a VA examination for mental disorders. The examiner should render specific findings with respect to the existence and extent (or frequency, as appropriate) of: memory loss; depressed mood; anxiety; panic attacks; sleep impairment; impaired judgment, speech, impulse control and/or thought processes; neglect of personal hygiene and appearance; suicidal ideation; delusions and/or hallucinations; gross impairment in thought processes or communication; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); and disorientation to time or place. The examiner should render a multi-axial diagnosis, including assignment of a Global Assessment of Functioning (GAF) scale score that represents the level of impairment due to the Veteran's PTSD, and an explanation of what the score means. 

Based on review of the Veteran's documented medical history and assertions, the examiner should also indicate whether, at any time since the April 2008 psychiatric treatment note the Veteran's service-connected psychiatric disability has changed in severity; and if so, the approximate date(s) of any such change(s), and the extent of severity of the disability at each stage. 

c) After the above has been completed, the RO should schedule the Veteran for a VA examination in connection with his TDIU claim. 

The examiner should opine as to whether, without regard to the Veteran's age or the impact of any non service-connected disabilities including his PTSD, it is at least as likely as not that any one or a combination of his service- connected disabilities, namely his PTSD, hearing loss and tinnitus, render him unable to secure or follow a substantially gainful occupation. A complete rationale for any opinion expressed and conclusion reached should be set forth.

Each examiner should set forth all examination findings, along with complete rationale for any conclusions reached, in a printed (typewritten) report. 

5. If the Veteran fails to report to any of the scheduled examinations, the RO must obtain and associate with the claims file (a) copy(ies) of any notice(s) of the date and time of the examination sent to him by the pertinent VA medical facility. 

6. To help avoid future remand, the RO must ensure that all requested actions have been accomplished (to the extent possible) in compliance with this REMAND. If any action is not undertaken, or is taken in a deficient manner, appropriate corrective action should be undertaken. Stegall v. West, 11 Vet. App. 268 (1998). 

7. After completing the requested actions, and any additional notification and/or development deemed warranted, the RO should adjudicate the issue of entitlement to TDIU and readjudicate the claims for service connection for obstructive sleep apnea and an increased rating for PTSD.

If the Veteran fails, without good cause, to report to a scheduled examination, in adjudicating the claim, the RO should apply the provisions of 38 C.F.R. § 3.655(b), as appropriate. 

The RO should adjudicate the increased rating claim in light of all pertinent evidence and legal authority, to include consideration of whether "staged" rating of the Veteran's disability, pursuant to Hart (cited above) is appropriate. 

8. If any benefit sought on appeal remains denied, the RO must furnish to the Veteran an appropriate supplemental SOC that includes clear reasons and bases for all determinations, and afford him the appropriate time period for response before the claims file is returned to the Board for further appellate consideration. 

The purpose of this REMAND is to afford due process and to accomplish additional development and adjudication; it is not the Board's intent to imply whether the benefit requested should be granted or denied. The appellant need take no action until otherwise notified, but he may furnish additional evidence and/or argument during the appropriate time frame. See Kutscherousky v. West, 12 Vet. App. 369 (1999); Colon v. Brown, 9 Vet. App. 104, 108 (1996); Booth v. Brown, 8 Vet. App. 109 (1995); Quarles v. Derwinski, 3 Vet. App. 129, 141 (1992).

This REMAND must be afforded expeditious treatment. The law requires that all claims remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate 
action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2011). 




______________________________________________
JACQUELINE E. MONROE
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs